CHANDLER *v.* PRESTON.

1. Trusts—Existence of Relation of Trustee and Cestui Que Trust.

     The relation of trustee and *cestui que trust* begins with the execution of the trust agreement; during the preliminary negotiations no such relation exists.

2. Same.

     Although prior to the execution of a trust deed and agreement the proposed trustee offered to assume said trust for a certain compensation, he had a legal right, prior to its acceptance, to withdraw said offer and submit a new one naming a larger sum, notwithstanding his action was induced by information received from an agent of the *cestui que trust* that the latter would pay more than the sum first named.

3. Same—Breach of Trust.

     The withdrawal by the proposed trustee of his first offer, and his acceptance of a counter proposal by the *cestui que trust* naming a larger amount, did not constitute a breach of trust or a fraud upon the latter.

4. Same—Breach of Trust—Termination—Conduct of Trustee —Evidence—Finding of Court.

     On a bill for the removal of the trustee, for an accounting,

for the termination of the trust, and to determine the amount of compensation to be paid the trustee for services already rendered, testimony *held*, to sustain the finding of the court below that in the sales of trust property made, and the prices obtained for same, the conduct of the trustee was not open to criticism.

5. SAME—COMPENSATION OF TRUSTEE—MUTUAL MISTAKE—RESCISSION.

The fact that the sales of land during the existence of the trust did not amount to as much as contemplated, *held*, not to justify the holding of the court below that therefore the compensation of the trustee was fixed under a mutual mistake of fact and should be rescinded.

6. SAME—ACCOUNTING—CONSTRUCTION OF CONTRACT.

Where the trustee neglected to furnish the money at six per cent. to take up mortgages bearing seven per cent. when they matured, as the trust agreement provided he should do, he should be charged with the amount paid in interest in excess of six per cent. on the overdue mortgages after maturity.

7. PARTIES—INTERVENERS—STATUTES—INTEREST IN LITIGATION.

Under 3 Comp. Laws 1915, § 12362, an attorney who acted as a go-between in the procurement of a trust agreement, and who was to receive part of the compensation to be paid to the trustee for his services, had such an interest in the subject-matter of the litigation as would give him the right to intervene in a proceeding involving the right of the trustee to recover under the contract.

8. PRINCIPAL AND AGENT — DUAL CAPACITY — NOTICE — AGENT'S RIGHT TO RECOVER.

Under well established rules of law, where the principals have knowledge of the fact that an agent is acting in a dual capacity, and assent thereto, he may recover for his services from either party.

Appeal from Alpena; Emerick, J. Submitted April 30, 1919. (Docket No. 46.) Decided October 6, 1919.

Bill by Merritt Chandler and another against Thad B. Preston and another for the removal of defendant Preston as trustee, for the termination of the trust, and for an accounting. George E. Nichols intervened,

claiming an interest under a contract with defendant Preston. From the decree rendered, all parties appeal. Modified, and affirmed.

*Henry & Henry* (*H. E. Spalding*, of counsel), for plaintiffs.

*Hawley & Eldred*, for defendants.

*Ellis & Ellis*, for intervener.

This is a bill for the removal of a trustee. It prays also for an accounting, for the termination of the trust, and for the reconveyance of the trust property to the plaintiff Merritt Chandler. By agreement of the parties during the trial, the issues were broadened to include the determination of the amount of compensation to which the defendant Preston is entitled as trustee and the establishment of an equitable lien on the trust property therefor. Mr. Hinkley, an agent of Mr. Preston in the administration of the trust, is joined as a defendant, but the substantial issues are between Mr. Chandler and Mr. Preston. Mr. Nichols' claim as intervener is based upon a separate agreement between Mr. Preston and himself, by the terms of which he was to receive a certain portion of the compensation which the trust agreement provided for Mr. Preston. Both the plaintiffs and the defendant Preston have appealed from the decree of the circuit judge made after a full hearing of the controversy.

The principal facts disclosed by the evidence are as follows. In the year 1912, the plaintiff, Merritt Chandler, who resides at Onaway, Presque Isle county, was the owner of large holdings of timber lands and other lands in Presque Isle and Cheboygan counties, also a large farm near Onaway, and a store and other property in that city. From time to time prior thereto, however, he had been borrowing money in

considerable amounts, some of it at a high rate of
interest, and had also allowed other indebtedness to
accumulate against him, with the result that, for some
years prior to 1912, the interest on his obligations, the
taxes on his lands, and other necessary expenses, had
exceeded to a considerable extent the entire income
he was able to realize from all sources at his com-
mand. His situation had been growing steadily worse
until he had reached a point where he was refused
further loans and further extensions of those which
were maturing; his creditors were pressing him, some
of them had taken judgments against him, and others
were threatening bankruptcy proceedings. In this
emergency he began a search for some person or cor-
poration whom he might induce to take over his prop-
erty in trust, to advance sufficient money to meet his
more urgent indebtedness, and to inspire confidence
in his remaining creditors so that they might further
extend credit, until sufficient of his property could be
disposed of to liquidate his entire indebtedness or re-
duce it to a point where his remaining possessions
could be profitably held. His first efforts in this di-
rection failed, but while he and his attorney, Mr. De-
Vere Hall, were returning from an unsuccessful trip
to Grand Rapids and Chicago on this errand, they
chanced to meet on the train Mr. George E. Nichols,
an attorney, of Ionia, to whom they explained the pur-
pose of their journey, with the result that he took up
the matter with the defendant, Mr. Thad B. Preston,
a business man of Ionia, of large means and wide and
diversified business interests, and secured a proposi-
tion from him which, on August 2, 1912, culminated
in a trust arrangement, the details of which were as
follows:

(*a*) Mr. Chandler (his wife joining) executed to
Mr. Preston a trust deed of all his real estate, com-
prising some 30,000 acres;

(*b*) Mr. Chandler also executed a bill of sale to Mr. Preston of all his personal property, except household goods and wearing apparel;

(*c*) A trust agreement was entered into between Mr. Chandler and Mr. Preston, which, after certain preliminary recitals, contained the following provisions:

"It is mutually agreed between the parties hereto as follows:

"1st. That under and by virtue of the terms of said deed and bill of sale, the second party shall have full power and authority to sell and dispose of any and all of the property, if necessary, of the first party, as trustee, with reasonable dispatch consistent with fair valuations, for the purpose of liquidating the debts, obligations and liabilities, as hereinbefore stated, but it is understood that no sale shall be made by the second party, as trustee, without first consulting the first party in regard thereto.

"2d. That after the payment, adjustment or satisfaction of the debts, liabilities and obligations of the first party and the entire expenses of the trust and any other expenses of executing, carrying out said trust, which expenses shall include those necessary expenses incurred by the trustee, attorney fees, taxes, repairs, improvements, labor, material and other matters or things required to successfully and properly handle and control the business and derive, so far as possible, a revenue therefrom, such property as remains on hand, or in the name of the trustee, shall thereupon be reconveyed to the said first party, or his representatives or assigns, provided, however, that by mutual arrangement in writing between said parties hereto, said trust may be closed before the payment of all the obligations, debts and liabilities of the first party.

"3d. Said second party shall have five years from the date of this instrument to complete and carry out the terms and conditions of said trust if necessary, but in case the said second party is able to close and complete said trust, or if it is so mutually agreed in writing between the parties hereto, the property con-

veyed by said deed and bill of sale may be reconveyed at any time that the parties hereto shall so mutually agree, but in no case as long as any creditors of the first party interested in this trust shall object thereto.

"4th. The second party is to furnish such sums of money as may be required to pay any and all of the obligations, debts and liabilities of the first party, together with the interest thereon as the same may fall due, or as the creditors of said first party may rightfully demand payment, and for all such sums advanced the second party is to be paid from out of the assets of said estate six per cent. annual interest while such money so advanced remains in use, and the first party is to execute and deliver his notes payable from time to time bearing six per cent. interest and secured by said trust to the second party for such moneys so advanced.

"5th. Upon the delivery of said trust deed and bill of sale and this instrument, the second party is to have the full management, control and possession of said property in every way with the right to dispose of the same as he may think best, and to that end the second party is authorized to employ some competent person at an annual salary not exceeding twenty-five hundred ($2,500) dollars a year who shall take active charge of said property and business and who shall consult with first party from time to time in relation to the management and disposition of said estate, and in case of the failure of the first party and said person so in charge of said property to agree upon the disposition and management or control of said estate, or any other matter of dispute, the same shall be referred to and finally determined by second party, whose determination shall be final on all matters.

"6th. The second party expressly agrees not to permit any property belonging to said estate, or conveyed under said trust instruments, to be sold under any execution or mortgage foreclosure sale for any of the debts, obligations or liabilities of the first party herein mentioned, without the consent of said first party in writing and any violation of this provision shall be deemed a sufficient ground to declare the trust ended, and upon paying to the second party the amount of money that he, at the time of such declaration, has

actually advanced, with interest at six per cent. thereon, he shall reconvey all the property held under said trust and surrender the notes given in connection with said trust as compensation for the services of said second party; provided, however, that second party shall have notice of such execution or foreclosure sale for a sufficient time prior thereto to permit him to pay the same and protect the property from the sale.

"7th. The second party is to pay all taxes upon said property when due and to fully protect the property from being sacrificed in every way, so far as possible, consistent with good management, and manage, operate and control the same in the first party's interests to the end that after paying his debts, obligations and liabilities, and the compensation to said trustee and the other expenses of said trust, that as much of the property shall be returned to first party as is possible under all the circumstances.

"8th. The second party, as such trustee, agrees to pay to the first party two hundred ($200) a month for his services in assisting in the carrying out of the business in connection with said trust, looking after and disposing of the property, which said amount shall be charged to expenses and, if advanced by the second party, he shall be entitled to interest thereon from the time of such advancement until repayment, and it is expressly understood that such employment of the first party by the second party shall and in no way will impair or limit the authority of the second party as trustee as hereinbefore provided.

"9th. At the time of the delivery of this instrument and said trust deed and bill of sale, or as soon thereafter as reasonable and convenient, the second party, as trustee, shall make a complete inventory of all the property and assets, real and personal, coming into his hands and under his control, and shall deliver a copy thereof to the first party, which inventory shall consist simply of a sufficient description of the property, without valuations attached thereto.

"10th. The second party shall keep books showing a full and complete statement of the entire trust matters, showing the time when and the amount of all moneys advanced and for what purpose, the amount of disbursements and for what purpose, and the

amount of receipts and from what sources, and shall furnish the first party with a statement of the affairs of said trust every ninety (90) days, or oftener, if requested, in writing, and the first party shall have access to such books at any and all reasonable times.

"11th. The first party, at the date of this instrument, shall deliver to the second party his notes payable on or before five (5) years from date for the sum of twenty-five thousand ($25,000) dollars, bearing six per cent (6%) interest in such amounts as the second party may desire, and which notes are given as compensation for second party's services as trustee, and in the management and control of said property, and shall be secured by the said trust and shall be paid before the first party can require the reconveyance of said property, or any part thereof, except as hereinbefore stated, and said second party, as such trustee, shall thereupon be paid no further sum for such services.

"12th. It is understood, however, that in the management of the estate, if occasion arises when the first party shall be able to negotiate the sale of any pieces or parcels of property belonging to said estate advantageously, that he reserves the right to make such sale at prices not less than the inventory valuations as prepared by one E. J. James and dated June 1st, 1912, a copy of which is in the hands of said trustee, turning the money over to the possession of the said trustee at once, and in case the proposed sale of the property is at an amount less than the inventory valuation, then said sale shall only take place upon the second party's approval, or the approval of his representative.

"13th. It is the intention and purpose of this trust that the first party shall place in the hands of the second party as trustee his entire property, to the end that the second party shall pay off all of his liabilities, debts and obligations, but in doing so the second party may sell and dispose of any part or portion of said property, real or personal; that he may encumber the same for the purpose of gaining extensions of time on any obligation; that he may exercise his best judgment as to the best manner and means of achieving the end desired, to wit, the relief of the first

party from his present embarrassed condition and turning back to him his property, or so much thereof as shall remain on hand, either free from all obligations and encumbrances, or in such a condition that he shall be able to manage and control the same without the aid and assistance of the second party.

"14th. To that end and for that purpose the second party has accepted said trust and agrees with the first party that he will faithfully and honestly and without unnecessary delay, carry out and execute the terms and conditions of this trust in every respect and particular, and, so far as possible, with the consent, approval and approbation of the first party in all things.

"15th. It is expressly understood that the party of the second part in no wise obligates himself personally to pay any of the debts, obligations or liabilities of the first party beyond the terms and conditions of this trust."

The inventory referred to in paragraph 12th of the above agreement as having been made by Mr. E. J. James (who, it appears, was assisted therein by one Jesse Morrill) included 46,632 acres of land, outside of the city property and the so-called "Home farm" or "Allis lands." It also included the personal property then owned by Mr. Chandler. The "Home farm," of 927.37 acres, was shown separately, the land being valued at $18,073.70 and the buildings at $19,175.00, total $37,248.70. The aggregate value of Mr. Chandler's property, as shown by this inventory, was $340,-603.91.

Immediately upon assuming the trust, Mr. Preston, pursuant to the provisions of paragraph 5th of the agreement, sent Mr. Alexander Robertson to Onaway as his representative. Mr. Robertson at once prepared an inventory of the trust property, the values therein being fixed largely by Mr. Jesse Morrill, who had assisted in the preparation of the "James inventory." The "Roberton inventory" included 41,097 acres of land, outside of the "Home farm" and the city prop-

erty, which were shown separately. The personal property was also included. Though less property was shown by this inventory than by the "James inventory," the total valuation exceeded that of the James inventory by some $84,000, being in exact figures $425,337.72.

Of the farm lands, some 1,170 acres were cleared, at least partially, though only about 400 acres had been fully cleared so as to be fit for profitable cultivation. The remainder had not been stumped, and much of it had grown up to shrubs and underbrush. A considerable portion of plaintiff's land was timbered. Upon it were two valuable water powers.

In the "James inventory," Mr. Chandler's liabilities were stated to be $160,304.71 absolute, and $2,150 contingent; in the "Robertson inventory" $114,119.70 absolute, and $1,957.19 contingent; in the recitals of the trust agreement it was estimated at $118,000; the plaintiffs now claim it was only about $113,000, while defendant computes the actual indebtedness at the date of the trust agreement as about $125,000, aside from the $25,000 in notes given to the defendant for his compensation pursuant to the terms of paragraph 11th of the agreement, and in support of these figures he sets up in his brief a large number of items paid by him, as trustee, of indebtedness incurred prior to the trust, which were not included in Mr. Chandler's estimate. About $78,000 of the indebtedness was secured by mortgages on portions of plaintiff's lands.

Mr. Chandler was 68 years of age when this trust arrangement was made. He had then held most of his lands some 25 or 30 years. He had had a long experience in dealing in lands, had done considerable lumbering, and had developed and carried on the farm referred to. It appears, however, that he was over sanguine, lacked financial judgment, and had exaggerated ideas of the value of his holdings. His farm was

well provided with tools and farming implements, well stocked with cattle, and produced large quantities of hay. The testimony was conflicting as to whether it was operated at a profit or a loss. It seems to be conceded that his store at Onaway was losing money. At the commencement of the trust, the annual interest charged against Mr. Chandler was approximately $9,-000, and the annual expense for taxes about $7,000. There was also the expense of insurance upon the farm buildings, dwelling houses and the store block. The trust arrangement added an expense of $2,500 a year for a manager, and required the payment of $200 per month to Mr. Chandler.

Mr. Preston at once began to advertise for sale the lands embraced in the trust. These advertisements were inserted in newspapers, agricultural journals and magazines, both in English and in foreign languages, not only in Michigan, but in other States, in order to interest prospective purchasers or real estate agents who might assist in disposing of the lands. He also directly interested a number of real estate agencies in making efforts to effect sales. From the outset there was a disagreement between Mr. Chandler and Mr. Preston in regard to the values of the lands and the prices at which they should be sold, and it is the claim of Mr. Preston that Mr. Chandler's attitude greatly hindered and embarrassed him in making sales. In a letter written by Mr. Chandler to Mr. Preston on January 2, 1913, he said:

"Our difference really is in what should be considered a fair price for the land sold, and if there is a loss resulting from my plan of holding till there is some demand for the land that will make the price better, the loss will fall on me in the end."

The amount of land sold by the trustee was comparatively small. During his administration of the trust estate, the trustee received from rents, sales of

lumber and timber, sale of the store, sale of farm produce and stock, with other miscellaneous receipts, exclusive of land sales, nearly $93,000. Of the land, he sold altogether (partly in cash sales and partly on land contract) 6,459 acres, besides certain city lots, the prices obtained aggregating about $50,000. In addition, one of the water power properties was sold for $25,000. At the time this suit was instituted, the trustee· held, in the form of land contracts and bonds taken in connection with the above sales, quick assets aggregating about $48,000. It appears from the evidence that, notwithstanding the sales made by the trustee, the annual interest charge and the annual expense for taxes at the time this proceeding was begun were no less than at the commencement of the trust. The total indebtedness of Mr. Chandler's estate at the time of the filing of the bill herein appears to have been about $122,000 plus the notes for $25,000 given to the trustee for compensation. More than half of this $122,000 was due to Mr. Preston for money advanced to take care of such portions of Mr. Chandler's indebtedness as had matured, and for which the creditors were pressing for payment.

Mr. Robertson remained as general manager of the trust estate until April, 1915, when he was succeeded by Mr. Algernon V. Hinkley, who was president of the Onaway State Savings Bank. He remained in charge during the balance of the trust period. Both Mr. Robertson and Mr. Hinkley appear to have been chosen with the approval, if not at the express suggestion and request, of Mr. Chandler. Mr. Preston's instructions to each of these managers were, to conduct the business economically, to get rid of all unnecessary expense, to sell all the property that could be sold at a fair price, and to obtain for Mr. Chandler full consideration for every dollar of the value of his property, to do nothing that would sacrifice in any way any of

Mr. Chandler's equities or rights, and to consult with Mr. Chandler about everything they did; in case of a difference between them, to refer the matter to Mr. Preston for his decision.

About six months before the expiration of the trust, Mr. Chandler filed the bill of complaint in this matter and obtained an injunction restraining the trustee from selling or disposing of any more real or personal property. The bill complained that the trustee was wasting the trust property, that he had sold too much of the trust estate and at too low prices, and alleged that he intended to further sacrifice the real estate and personal property of the trust estate in order to obtain money to pay the debts of plaintiff Chandler and the expenses of administering the trust. After a full hearing of the case, the circuit judge filed the following memorandum opinion:

"It seems to me, in view of the elaborate briefs from counsel, covering every possible phase of the litigation, that a concise statement of my opinion and conclusions upon the law of the case and the facts as I deem them established by the proofs, is more desirable than an extended argument in support of the same. I therefore state such opinion and conclusions as follows:

"1. Preston was not, either under the spirit or the letter of the trust contract, to devote all, or even the greater part of his personal attention to the administration of the trust.

"2. Neither was he to pay in the first instance all of the debts and so become the sole creditor of the trust estate.

"3. He sold all the property that anyone could have sold, and more than Mr. Chandler wished him to sell, at the best possible prices obtainable at the time. Mr. Robertson was a more efficient man, by reason of his experience and qualifications, to manage and push the sale of the lands and other property at home and abroad, and oversee and conduct the business at Onaway, than Mr. Preston. Mr. Preston should not have been removed for failing to sell more.

"4. He sold the little he did sell for a reasonably fair price, and should not have been removed for selling too low.

"5. Preston's failure to redeem from certain foreclosure sales worked no loss to the trust estate.

"6. No damages should be allowed against the trustee. He has administered the trust with a fair degree of industry and skill.

"7. The agreement for the compensation of the trustee at $25,000 was made upon a mutual mistake of fact. The fact was that in August, 1912, when this contract was made, and from thence hitherto, there was and has been absolutely no market, in the region where the Chandler lands were situated, for any considerable quantities of land. After extensive advertising and much publicity, mere driblets of the land could be, or were sold, but not nearly enough to pay the overhead expense of the estate. As to this existing, concrete fact both men were mistaken, although it was notorious to others. If it were not that both were mistaken as to this fact, Chandler would not have agreed to pay, and Preston would not have exacted the sum of $25,000. This mistake should annul the agreement to pay $25,000 and only allow the trustee an equitable compensation for his services—say $5,-000, without interest. This may be a novel application of the doctrine that a mutual mistake as to the essential elements, or subject-matter, of a contract avoids the same, but, if sustained, it is a highly equitable one in this case. Besides, it will, perhaps, eliminate the contest between the intervening defendant, Nichols, and the defendant Preston as to the interest upon this sum of $25,000.

"Mr. Preston has an equitable lien upon the trust property as a security for the money advanced by, or earned by him under the trust contract. These sums as of August 1, 1917, have been ascertained and fixed by the report of the auditor. Any changes made by later transactions will be computed up to the settlement of the final decree. The decree will provide for a liberal, but definite, time for the payment of the amount so found to be due the trustee, and that in default of payment the property be sold as upon foreclosure."

The facts connected with the claim of Mr. Nichols, intervening defendant, are as follows: When Mr. Nichols first undertook to find someone to assume the trusteeship for Mr. Chandler, the latter agreed to pay him $500 for his services, if successful, with the understanding that he might secure such further compensation as he might be able to arrange for from the party he produced. Mr. Preston's original memorandum of the terms upon which he would accept the trust called for compensation of $25,000, without interest. Mr. Nichols returned to him with a statement of the terms Mr. Chandler would agree to, which provided for compensation of $25,000, with 6% interest. After Mr. Preston had signified his assent thereto, Mr. Nichols suggested that Mr. Preston give him half of the amount of the interest on the $25,000, viz., $3,750, for his services, to which Mr. Preston agreed, and on August 19, 1912, Mr. Preston wrote Mr. Nichols as follows:

"Yours of the 12th came just as I was leaving for the north. I have received from Merritt Chandler his notes aggregating $25,000 running five years 'on or before' with interest payable at 6%. My arrangement with you is that one-half of the interest on these notes when and as paid is to be turned over to you. If the aggregate amount of such interest paid to you on or before five years does not equal $3,750, I am to pay you, but only out of my share of the interest money I receive on said notes, an amount which with what has been paid you shall equal said sum of $3,750."

Thereafter, Mr. Nichols promised Mr. DeVere Hall to pay him the first $1,000 that was received from Mr. Preston on this account. In 1913, Mr. Preston paid himself one year's interest on these notes for $25,000, amounting to $1,500, and he paid over one-half of this, $750, to Mr. Nichols, who in turn paid it over to Mr. DeVere Hall. Sometime in 1913, Mr. Preston sold these notes to third parties to obtain

money to use in other enterprises. As trustee, he continued to pay the interest on these notes down to the time of the commencement of these proceedings, the interest being forwarded to the then holders of the notes. He paid nothing further to Mr. Nichols. Mr. Preston's first knowledge of the agreement between Mr. Nichols and Mr. Hall came in a letter written him by Mr. Nichols May 20, 1915, as follows:

"I am enclosing a letter from Ray A. Hall, who is executor of the DeVere Hall estate. Under my arrangement with Mr. Hall he was to have $1,000. I paid him the $750 out of the first interest you paid me, and there is $250 coming to the estate. He has written me two or three times about it. Is there any way the matter can be fixed up? I don't feel that I should be called upon to advance the money, and I didn't know but what the matter now was in a situation where you could pay the $750 due me last July. Anyway, if you cannot do that, kindly write me a letter as to the conditions so I may send it to Mr. Hall and satisfy him that so far as I am concerned I am doing all that can be done and not retaining any money due the estate."

In his argument on this appeal plaintiff seems to have abandoned his position that the trustee was wasting the trust property by sacrificing same to raise money to pay off the indebtedness, and now states his complaint as follows:

"Aside from the obligation to deal honestly and faithfully, which is the basis of every trust, the terms of the trust required him to pay off the indebtedness from the property and proceeds and meanwhile to furnish any funds necessary to discharge at maturity all debts and to protect the property against loss. The property did not and could not produce revenue sufficient to meet more than a fraction of the fixed charges for interest and taxes and the expense of administration. The obviously proper course, the only possible method of accomplishing the ends of the trust was to effect sales, even at a sacrifice, of enough of the prop-

erty to pay off the indebtedness or of at least reducing it to such a point that the ordinary revenues would meet fixed charges. While the trustee was not required to guarantee such results, he must have understood at the outset that success or failure depended upon his devising and carrying out a policy that would accomplish them. * * *

"Mr. Chandler was visionary and impracticable, optimistic and trusting. Mr. Preston was of a different type. He foresaw the inevitable end from the beginning. What was his duty considering the power with which he was vested and the situation as he saw it? Plainly to disregard Chandler's opinions, which he knew were wrong, and act on his own judgment, which was (notwithstanding his attempted qualification of his admission) that property should be sold until the debts were reduced to manageable proportions.

"To effect this, instead of treating every sale as a proposition by itself, referring purchasers to Chandler or delaying the sale to overcome his objections and thereby risking its loss, the obviously proper course was, at the outset of the business after a full discussion with Mr. Chandler, to determine once and for all a general schedule of prices such as the trustee's judgment should approve. *This was the trustee's capital duty and this he never did.*"

Plaintiff summarizes his grounds of appeal as follows:

"1. In the formation of the trust, Mr. Preston, having first offered to one of Mr. Chandler's attorneys to take in full compensation for his services $25,000, payable in five years at the expiration of the trust without interest, afterwards bargained with this attorney (Mr. Chandler being ignorant both of Preston's original offer to forego interest and of this bargain) for an increase of that compensation by the addition of interest, and for a division of the excess between himself and the attorney.

"2. The trustee failed at the outset to frame any proper policy for the management and sale of the trust property, failed to give the trust proper attention and management, paid unnecessary interest, failed to carry out his obligation to refund matured indebt-

edness at lower interest, all with the design of preventing a reduction of indebtedness, to the end that he himself might acquire the trust property for the amount of the liens."

KUHN, J. (*after stating the facts*). 1. The relation of trustee and *cestui que trust* between Mr. Preston and Mr. Chandler began with the execution of the trust deed and agreement. During the preliminary negotiations no such relation existed. The parties were strangers to each other, and were dealing at arm's length. Mr. Preston was under no obligation whatever to assume the trust, and the only appeal the proposition had for him was from the standpoint of a business venture. It involved some risk on his part. The essential feature of the transaction was his agreement to finance the trust estate for the period of five years, which, under adverse conditions, would require the furnishing of an indefinitely large sum of money. And this was of the utmost importance to Mr. Chandler. What the consequences to him might have been had he been unable to find anyone with both the ability and the willingness to render this assistance, it is impossible to estimate. It is clear, therefore, not only that Mr. Preston had the right in the first instance to demand such compensation as would make it worth while for him to undertake the risks and burden of this unusual trust arrangement, but also that at any time prior to the acceptance of his terms, he had the right to revoke or alter his proposition, and in doing so to increase his demand for compensation, if, upon reflection, he was dissatisfied with his first figure. Had he received an intimation from any outside source that Mr. Chandler was willing to pay a larger compensation than that suggested in Mr. Preston's proposal, Mr. Preston clearly would have had a legal right to withdraw his offer and to submit a new one naming a larger sum. The fact that his information came

through Mr. Chandler's agent does not alter the situation in point of law. Mr. Preston was still under no obligation to enter into the transaction at all. Mr. Chandler, instead of accepting Mr. Preston's offer, had made a counter-proposition embodying several new features, among others an agreement on the trustee's part to pay Mr. Chandler $200 a month during the entire five-year period. Up to the moment of acceptance, therefore, Mr. Preston was free to do as he pleased and to insist upon such terms as he pleased. The provision for the payment of interest on the $25,-000 which Mr. Preston was to receive as compensation was embodied in this counter-proposition of Mr. Chandler's. There is no merit to plaintiffs' contention that Mr. Preston's acceptance of this offer was, under the circumstances, a breach of trust and a fraud upon the beneficiary.

2. After a careful reading of the testimony, we have reached the conclusion that the plaintiffs' second contention is also unfounded. We agree with the trial judge that Mr. Preston administered the trust with a fair degree of industry and skill, that he sold all the property anyone could have sold, and more than Mr. Chandler wished him to sell, and that he obtained reasonably fair prices for the property sold and the best prices obtainable at the time. Under all the circumstances of the case, we do not think he is open to criticism either for selling at too low prices, as urged in plaintiff's bill, or for not making greater sacrifice of the trust property in order to reduce the indebtedness and diminish the interest and taxes, as plaintiffs urge so strongly on this appeal. We think it also clearly appears that both Mr. Robertson and Mr. Hinkley were competent managers.

3. The trial judge was in error in holding that the agreement fixing the compensation of the trustee at $25,000 was made under a mutual mistake of fact.

The salability of land during a period of five years in the future is not an existing fact. Most purchases and sales are based upon the judgment of the parties as to future value. A mistake in judgment in that regard is no ground for the relief of either party. 1 Black on Rescission and Cancellation, § 146; *Parke* v. *City of Boston,* 175 Mass. 464 (56 N. E. 718); *DuBois Borough* v. *Water Works Co.,* 176 Pa. 430 (35 Atl. 248, 34 L. R. A. 92); *Taylor* v. *Ford,* 131 Cal. 440 (63 Pac. 770); *Chicago, etc., R. Co.* v. *Wilcox,* 116 Fed. 913, 54 C. C. A. 147. What we have said above as to the value of Mr. Preston's services to Mr. Chandler is pertinent in this connection also. We think the trustee was entitled to his compensation as agreed.

4. We agree with the contention of plaintiffs' counsel as to the construction of the 4th paragraph of the trust agreement, above set forth. It clearly refers to two classes of indebtedness, and by its terms Mr. Preston was to take up indebtedness of fixed maturity when it became due, and indebtedness due upon demand when demand was made. All of the mortgages upon Mr. Chandler's property matured on fixed dates. They bore interest at 7%, payable semi-annually. The holders of these mortgages, however, were willing to let them run after maturity. Mr. Preston interpreted the contract to mean that he was not obliged to take up indebtedness of any kind until the creditor insisted upon payment, and accordingly did not take up such of these mortgages as became due. The trustee should, therefore, be charged in the accounting with the further amount of $2,384.67, being the interest in excess of 6% paid on the overdue mortgages after maturity.

5. We are of the opinion that by virtue of section 11, chapter 12, of Act No. 314, Public Acts of 1915 (3 Comp. Laws 1915, § 12362), the defendant Nichols had such an interest in the subject-matter of the litigation as would give him the right to intervene, in

accordance with the holding of this court in *Weatherby* v. *Kent Circuit Judge,* 194 Mich. 46; *McMillan* v. *School District,* 200 Mich. 280; and *Detroit, etc., Loan Ass'n* v. *Oram,* 200 Mich. 485. It appears clearly that his interest in the subject-matter is of such a direct and immediate character that he will either gain or lose by the direct legal operation and effect of the decree of this court determining the right of the defendant Preston to recover for his services in accordance with his contract.

We are satisfied from this record that Nichols was acting as a go-between. In the first instance he was acting for Chandler, with the understanding that he might get such further compensation as he could from Preston. Preston was apparently willing to accept his services and agreed, as the record conclusively shows, to pay him for obtaining the contract which was finally executed and by which he receives the compensation which he demanded and was agreed upon. So far as Mr. Preston is concerned, it does not make much difference whether his contract was more favorable to him, as he claims, than if he had dealt directly with Chandler. Mr. Chandler did not testify with reference to this phase of the case and makes no complaint about it. We are impressed, on reading the testimony, that as by this opinion the contract entered into between the parties is sustained, in equity and justice likewise the claim of Mr. Nichols should be sustained for the services which he rendered for Mr. Preston and for which Mr. Preston agreed to pay. We think the record is convincing, by reading the testimony of Mr. Nichols, that he dealt fairly with both parties to the transaction, and under the well established rules of law, where the principals have knowledge of the fact that the agent is acting in a dual capacity and, with such knowledge, assent to his so doing, he may recover for his services from either

party. See 1 Am. & Eng. Enc. Law (2d Ed.), p. 1074; 2 Corpus Juris, p. 713; *Adams Mining Co.* v. *Senter*, 26 Mich. 73; *Colwell* v. *Keystone Iron Co.*, 36 Mich. 51; *Aldine Manfg. Co.* v. *Phillips*, 129 Mich. 243. The decree herein should provide that the intervener, Nichols, be paid by the defendant Preston the balance due him for his services, in accordance with the agreement made between the parties, with interest at 5% on sums received by Preston from the date such sums were thus received.

The decree of the lower court, as herein modified, will be affirmed, without costs to any of the parties' hereto.

BIRD, C. J., and MOORE, STEERE, BROOKE, FELLOWS, and STONE, JJ., concurred.

The late Justice OSTRANDER took no part in this decision.