CROMWELL et al. v. CURTIS et al.
No. 25.

Circuit Court of Appeals, Second Circuit.

Nov. 7, 1938.

Percival E. Jackson, of New York City, for appellants.

Edward H. Sykes, of New York City, for appellees.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

L. HAND, Circuit Judge.

Certain bondholders and shareholders of the Manati Sugar Company appeal from an order in bankruptcy in the reörganization of that company, making allowances to a committee of bondholders and to their attorneys. The appellants complain because the attorneys represented at the same time creditors and shareholders in the preparation of a plan of reörganization, in securing its acceptance and execution, and generally during the pendency of insolvency proceedings; and because the committee retained them, knowing that they did. The

debtor was a New York corporation organized in 1912 to make sugar in Cuba: it had issued a series of $5,500,000 bonds, secured (so far as Cuban law allowed) by its "immobile" assets, that is, roughly speaking, by its real estate: it had also issued $3,500,000 in preferred, and $10,000,000 in common shares. The business had been profitable up to 1930, but in that year the price of sugar fell, its affairs became financially embarrassed, and it was forced to borrow from banks for its cash needs; $3,994,600 of the bonds agreeing to take a position junior to the new loans. In 1931, bad times still continuing, the company was forced to borrow again, this time by the pledge of its floating assets: accounts, chattels and the like. By the end of that year it became apparent that it could not go on without the aid of a court, and on February 8, 1932, the usual sequestration bill was filed against it in the District Court for the Southern District of New York, and a decree by consent entered, appointing a receiver and enjoining all creditors from proceeding against it. Before this—in October, 1931—the company having defaulted in its bond interest, the original underwriters of the bond issue had organized a committee and invited the deposit of bonds. These did not at first come in in great quantities, but by October, 1936, when, as will appear, a plan of reorganization was submitted, seventy-seven per cent of the whole issue was in their hands.

A firm of lawyers of the name of Sullivan & Cromwell had represented the debtor from its organization: they also represented the bondholders' committee from its beginning, and they appeared for the debtor in the creditors' bill. The trustee under the mortgage got leave without opposition to foreclose in April, 1932; but a month later, the debtor having meanwhile made satisfactory financial arrangements for the time being, this leave was revoked on motion of Sullivan & Cromwell, and apparently without any objection by the trustee. From then until 1936 it was impossible to put through any plan of reorganization; the debtor was obliged to live from hand to mouth, awaiting a rise in the price of sugar, and the consequent accumulation of enough cash to pay the sums borrowed from the banks. Once during this period—in 1934—some bondholders, who had not deposited their bonds with the committee, made an abortive attempt to start a reorganization proceeding in bankruptcy, but except for

that, no opposition appeared in any quarter. By the summer of 1936 the bondholders' committee thought the time ripe to prepare a plan of reorganization which they presented to the court in the autumn. One shareholder at first objected to this, but apparently he became satisfied and the court after two or three hearings approved it on December 5, 1936. It provided for the foreclosure of the mortgage (a step then supposed to be necessary); and it gave to the bondholders new bonds, dollar for dollar, together with 64% of the shares of a new company to be organized; to the preferred shareholders 24% of the remaining shares; and to the common shareholders the balance, 12%. It also provided that the committee should see the plan through to execution, and to that end authorized them to receive deposits of bonds and of shares. Eventually 89.2% of the bonds, 61.8% of the preferred shares and 61% of the common were so deposited. It was later found undesirable to foreclose the mortgage—because of certain features of the Cuban law not necessary to describe— and for this reason in June 1937 the debtor filed a voluntary petition for reorganization in bankruptcy: Sullivan & Cromwell did not appear for it in that proceeding. The plan was then carried through without any important changes and at its conclusion the interested parties applied for allowances. All the appellants had held bonds of the debtor, which they had deposited with the committee; some of them held common shares as well. They intervened at the hearings, and protested against any allowances being granted to Sullivan & Cromwell, or to the committee, not because of the amount claimed, or of the value of the services rendered; but, as we have said, because the attorneys had acted for bondholders and shareholders, whose interests conflicted.

This supposed conflict may be divided into two periods; that between 1932 and 1936, when the company's affairs were being merely tided over, and that in which the reorganization was effected. In the first there was no conflict of interest whatever. The trustee's leave to foreclose was revoked without objection, and all efforts to reorganize were suspended for four years, because everybody knew that nothing could be done but to hold off executions and accumulate cash until the emergency loans had been cleared away. Even though the committee was, as it was, gathering up

bonds through that period, the bondholders and the shareholders were in one boat and that a very leaky one; their interests were common and there can be no valid objection to the attorneys for the company being paid for whatever they did to keep the craft afloat. When the plan of reörganization began to be prepared, it is true that the interests of the bondholders and the shareholders came into conflict; all that the bondholders got, came from the shareholders, and all that the shareholders got came from the bondholders; for the company was insolvent in every real sense; its bonds were selling at about 30. The committee did not however represent any shareholders and there could have been no objection to their preparing a plan; somebody had to prepare one, and there was no provision like § 169 of the present Bankruptcy Act, 11 U.S.C.A. § 569, by which a trustee might do it. The only vice, if it were a vice, in the plan was that the committee was helped by attorneys who represented the company. It is of course true that beneficially the company is the shareholders, and the shareholders are the company, and in that is the only force of the appellants' argument: the notion is that Sullivan & Cromwell, representing the shareholders with interests in conflict with the bondholders', could not with unclouded loyalty also represent the bondholders themselves; and any transaction so concluded was pervaded with this fundamental taint.

It seems to us that there are two answers to this. The first is that to represent the company during the insolvency was very different from representing the shareholders in preparing a plan of reörganization. While the company remained quiescent under the protection of the court, it was not the equivalent of the shareholders; it was a mere procedural skeleton, through which the common interests of all concerned—creditors and shareholders alike—could be, and were, protected. Although there was a receiver and he also represented both groups, that merely minimized the functions of the company and its attorneys; it did not change those functions, or make it less of a perversion to assimilate the position of the attorneys to that of attorneys for shareholders seeking recognition in the new company. The second answer results from the way in which the reörganization went through. Formerly—always before Northern Pacific Railway Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931, and

often thereafter—it was the practice to treat a plan of reörganization as something outside the suit in which the assets were sold on foreclosure or execution. The court did not concern itself with the purchaser's disposition of the assets; it allowed him, as assignee, to use claims against the defendant as credits upon the purchase price, for that avoided unnecessary bookkeeping; but except for that he was like any other purchaser. If he owed any duties to his assignors, that was matter for another forum and another suit. Had this reörganization been in that form and the attorneys for the committee really acted as attorneys for shareholders as well, there might indeed have been some question whether the plan could stand. When put into effect, it would have been a closed transaction, and a single attorney would have represented both sides. It would not have been enough to say that the beneficiaries could have learned of this; they are not charged to find out, though the transaction is valid if they do. Chandler v. Preston, 207 Mich. 244, 174 N.W. 205; Fryer v. Harker, 142 Iowa 708, 121 N.W. 526, 23 L.R.A.,N.S., 477; McGeehan v. Gaar, Scott & Co., 122 Wis. 630, 100 N.W. 1072; Restatement of Agency, § 392, Comment d. But here there was no closed transaction: the plan did not purport to conclude the bondholders or the shareholders; it was purely tentative, put forward as a mere proposal for the consideration of the court after hearings of which everybody interested was to have notice. After they had been heard, the court was to scrutinize and approve the structure of the new corporation; just as was required in reörganizations in bankruptcy under § 77B, 11 U.S. C.A. § 207, into one of which, indeed, this very suit finally turned. Upon that hearing any conflict of loyalty would become apparent at once: the judge knew whom Sullivan and Cromwell had represented, and could measure how far that could have resulted unfavorably to either principal. It has never been the law that the court may not approve such transactions when they are above-board; on the contrary they have gone through in a number of instances, even when the trustee was personally and pecuniarily interested. Scholle v. Scholle, 101 N.Y. 167, 4 N.E. 334; Corbin v. Baker, 167 N.Y. 128, 60 N.E. 332; Colgate's Executors v. Colgate, 23 N.J.Eq. 372; Farmer v. Dean, 32 Beav. 327; Tennant v. Trencher, L.R. 4 Ch.App. 537 (C. A.). Finally, although the plan authorized

the committee to receive the deposit of shares as well as of bonds and to complete its execution, this feature was approved with its general approval, and was within the competence of the judge to direct. We hold therefore that the court's approval of the plan removed any question touching supposititious conflicts of interest, and with it any possible infirmity in the right to allowances of the committee and its attorneys.

Order affirmed.